UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                              )  CRIMINAL ACTION
UNITED STATES OF AMERICA      )  NO. 02-127 (ADM/AJB)
                              )
         vs.                  )
                              )  Courtroom 13 West
(1) THOMAS JAMES MARTIN       )  Thursday, March 19, 2009
                              )  Minneapolis, Minnesota
------------------------------------------------------------

**HEARING ON DEFENDANT'S MOTION FOR EXEMPTION**

BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S :**

For the Government:    **OFFICE OF THE U.S. ATTORNEY**
                       By:  DAVID M. GENRICH
                            Assistant U.S. Attorney
                       600 United States Courthouse
                       300 South Fourth Street
                       Minneapolis, Minnesota  55415

For the Defendant:     **ENGH LAW OFFICE**
                       By:  PAUL C. ENGH, ESQUIRE
                       220 South Sixth Street - Suite 215
                       Minneapolis, Minnesota  55402

Court Reporter:        **TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
                       Official Court Reporter - U.S.D.C.
                       1005 United States Courthouse
                       300 South Fourth Street
                       Minneapolis, Minnesota  55415
                       612.664.5108

1          (11:00 a.m.)

2                          **P R O C E E D I N G S**

3                            **IN OPEN COURT**

4          (Defendant present)

5              THE COURT:  Good morning.  Please be seated.

6              THE CLERK:  The case before the Court is United

7      States vs. Thomas James Martin, Criminal Case 02-127.

8              THE COURT:  Let's see.  Let's begin by noting our

9      appearances.  I think we'll start at the plaintiff's table.

10             Mr. Genrich?

11             MR. GENRICH:  Good morning, your Honor.  David

12     Genrich for the Government.  At the table with me are Labor

13     Investigators Guy Heidenreich and Sheldon Rinehart.

14             THE COURT:  Thank you.  Good morning.

15             Mr. Engh.

16             MR. ENGH:  Paul Engh on behalf of Mr. Martin.

17     He's here today, your Honor.  Thank you.

18             THE COURT:  Good morning, Mr. Martin.

19             THE DEFENDANT:  Good morning, your Honor.

20             THE COURT:  It's been awhile since I've seen you.

21             THE DEFENDANT:  Yes.

22             THE COURT:  The matter before us today, as we all

23     I know are well aware, is Mr. Martin's request that he be

24     allowed an exemption from the disqualification period to

25     serve as a consultant or advisor to a labor organization.

1        Let's see.  And in terms of procedure or pattern,

2   I don't think there are enough of these motions -- this is

3   the first of mine -- to have an exact protocol, but I think

4   what -- I assume the defendant has the burden of proof on

5   this since the exemption is statutory.

6        So, I think, Mr. Engh, what I'll do is allow each

7   side about 15 minutes in whichever way you might want to

8   wish to proceed.  I know Mr. Martin probably has something

9   he wants to say personally and you've got a bit of an

10  argument, so you can slice up your 15 minutes in whatever

11  way you think makes sense.

12        MR. ENGH:  Okay.  Well, what we'd like to do then

13  is have Mr. Martin make a statement.  He's jotted his

14  thoughts down.

15        THE COURT:  Sure.

16        MR. ENGH:  We have one exhibit, which are the

17  letters we submitted to the Department of Labor in

18  conjunction with our request, and then I'll follow up with a

19  short argument with the time allotted.

20        THE COURT:  All right.  I think that makes sense.

21        Mr. Martin, would you be more comfortable to be at

22  the lectern?  Or if you'd rather sit on the witness stand,

23  either way is fine with me.

24        THE DEFENDANT:  Your Honor, I think I'd be more

25  comfortable at the lectern here.

1        THE COURT:  That's fine.

2        MR. ENGH:  I should add these are Mr. Martin's

3   words.  He's a bit nervous and so he's got an outline for

4   you.

5        THE COURT:  Not a problem.

6        MR. ENGH:  If he has to read to get through it,

7   he'll have to, but that's kind of what we're going to do.

8        THE COURT:  Whatever works for you.  That's fine.

9        THE DEFENDANT:  Thank you.

10        THE COURT:  And take your time.  If you'd like to

11   pour yourself a glass of water so that you're set, that

12   would be fine too.

13        THE DEFENDANT:  Good morning, your Honor.  I stand

14   before you today not to plead an argument, but to show and

15   to tell you about a changed man.

16        Your Honor, I'd like to thank you very much for

17   seeing me today and taking the time.  The last time I saw

18   you I stood before you a broken man, never imagining the

19   journey that I would be on.  I vowed to myself I would never

20   be in a courtroom again, but today here I am, not for any

21   wrongdoing, but to request an opportunity for a future for

22   me, a changed man.

23        Going to prison was a very -- was the darkest time

24   in my life.  I can remember like it was yesterday, riding up

25   to Duluth, the snow was blowing, the sleet was coming down.

1    I thought my life was over.  Thinking of the months ahead of

2    me, there appeared to be no end in sight and there would be

3    nothing left for me or of me when I finally got out.

4            Prison was a very humbling, gut-wrenching

5    experience that took away my dignity, my pride, my freedom,

6    and my choices.  It isolated me from my family and my

7    friends.  Until that day I had never been afraid of

8    anything, but then on that day I can remember I cried as we

9    drove to prison.

10           I will never forget the looks on my father's, my

11   wife's, or my children's faces, or the shame of having my

12   grandchildren visiting me in prison.  I had a lot of time to

13   think about my life, how I had spun out of control,

14   overtime, working 14 hours a day, destroying my first

15   marriage, really taking no time to think.  It became

16   all-consuming, my job did, and I just let it happen over

17   time.

18           Prison was a very and lonely dark time period for

19   me, though as time went on it also gave me time to think

20   about who I'd become and who I really wanted to be, what I

21   needed versus what I wanted, where I had failed and who I

22   had failed, and not only myself, but the people who loved

23   and believed in me.

24           There is so much time in prison, so much downtime.

25   Downtime is something I never had much of before.  Prison is

1    downtime.  It forces you to look within and asking yourself

2    questions, tough questions about who and what you are, what

3    you've become and where you went wrong.

4            You keep it -- you get to a very low point,

5    disliking, even hating yourself.  I had to dig deep.  If I

6    had to -- I had a lot of time to think about my actions,

7    both good and bad, what changes I needed to make in my life

8    and accept what I had done, the people I had wronged and the

9    people's trust that I abused.  I didn't like myself, so how

10   could others like me, let alone love me.

11           At a point I had to acknowledge and accept who and

12   what I had become, but that didn't mean I couldn't change.

13   I even began to welcome this time.  I came to an inner peace

14   within me.  I came to understand and respect the rule of

15   law, grateful of the little things that I never stopped to

16   think about previously and how precious my family and my

17   friends were.  I came to realize how fast my life was

18   passing, yet never stopping to think about what was most

19   important.  Excuse me.

20           THE COURT:  Remind me -- I know the sentence was

21   24 months.  How much did you end up actually serving?

22           THE DEFENDANT:  Nineteen days, 10 months, your

23   Honor.

24           THE COURT:  Okay.

25           MR. ENGH:  No, it was 19 months, ten days.

1          THE DEFENDANT:  What did I say?

2          THE COURT:  Nineteen months, 10 days.

3          THE DEFENDANT:  Oh, 19 months, 10 days.

4          THE COURT:  Close to 20 months.

5          THE DEFENDANT:  I came to realize how fast my life

6   was passing, yet never stopping to think about what was

7   important, being true to yourself or your beliefs, being

8   honest with myself or who I -- if I can't be honest with

9   myself, how can I be honest with others?

10          I prayed this would not kill my father, as he was

11   84 at the time and we were as close as father and son could

12   be.  We were best friends.  I was blessed with a loving wife

13   that came to see me every weekend and sometimes twice on one

14   weekend over the whole 19 months.  She would bring my dad

15   when he was up to it and other unfailing friends that I can

16   never thank enough came to see me.

17          The saying "You never know who your friends are"

18   is true.  I'm a very lucky person.  I know my friends and

19   what a precious gift they are.  Most importantly, I wanted

20   and needed to prove to myself, my family and my friends and

21   those that lost trust in me that I can do better, be better

22   than who I was.

23          Leaving prison gave me opportunities.  You can't

24   imagine how you can appreciate the simplest things:  the

25   love of my wife, my father, my children, my grandchildren

1    and my friends who came -- who cared so much about me.  I

2    was blessed to have three wonderful years with my father

3    before he passed away, but I can still see the

4    disappointment in my father's eyes.  It haunts me to this

5    day.

6              THE COURT:  Your dad was a union man too, right?

7              THE DEFENDANT:  Yes, your Honor.

8              Before I stopped -- before -- my whole family is

9    union, your Honor.

10             THE COURT:  Take your time.  It's all right.

11         (Pause)

12             THE DEFENDANT:  Leaving prison gave me many

13   opportunities.  You can appreciate the simplest -- okay.  I

14   did that.

15             But it still haunts me today, the look in my

16   father's eyes, the disappointment in his voice.

17             Before I never stopped to think about what freedom

18   really meant as it can be taken for granted so easily.  I

19   look around my community, my city, my state, my country that

20   I live in and I realize how blessed I am.  Until you have

21   everything stripped from you:  your reputation, your

22   finances, your privacy and your freedom, though done by my

23   own doings, I had never really had much thought in it.  I

24   took it for granted.  I was committed to my transition and

25   my probation, working with my probation officer, Lester

1   Harris, following all the rules and three years of probation

2   with no problems.

3           I started a business of my own as a home

4   inspector, but as you know, the housing market is at record

5   lows.  I'm a very young 63-year-old man when it comes to

6   attitude and energy, but as many others in the construction

7   trade, my body shows the scars of working with the tools.

8   Both my biceps have been ripped off the bones and surgically

9   reattached.  Unfortunately, one was not successful.  With

10  nerve damage in my arm, I do not have the range of motion

11  and unable to hold many tools properly.  I'm also in need of

12  a complete right shoulder replacement.

13          Today I stand before you again, your Honor.  I'm

14  proud to say I'm a construction worker, a plumber, but most

15  importantly a changed man, a better man than the one that

16  stood before you six years ago.  The only thing I know is

17  the construction trades.  My family, my friends, are all in

18  the trades.  It is something that is in my blood.  I just

19  can't let go.  I feel I have so much that I can offer to the

20  industry even though the market of high unemployment today

21  is approaching 50 percent.  I have ideas and a drive that I

22  think I can make a difference.

23          I would like to have that chance to help put my

24  members back to work so they can provide for their families.

25  I would also like to have a chance to go back to work and

1     redeem myself with the many people that once trusted me.  I

2     hope to prove that they can again.

3             I know I have done wrong, your Honor, and am truly

4     sorry for what I have done.  I believe I have served my time

5     for what I have done.  With the continued restrictions that

6     have been imposed upon me, I am unable to pursue any type of

7     career in the industry that I know and love other than

8     working with the tools which I can no longer do.

9             I hope and pray the Court will see that I have

10    served my time in prison, completed my probation and that I

11    am truly sorry for what I have done and all of those I have

12    hurt.  I hope some day to be able to forgive myself, as I

13    blame nobody but myself.  The hard part is I have not been

14    able to forgive myself.  I know I can prove to the Court,

15    the community, and the people that may no longer believe in

16    me that they can again.

17            Your Honor, I know I have failed.  I believe I

18    paid for what I have done, confined in prison, serving my

19    probation.  I have reestablished myself in society, becoming

20    a productive person.  I believe I have done this to the best

21    extent I can.  I would like to be able to be that productive

22    person, though, in the work that I love, the plumbing

23    industry.

24            I'm asking your Honor to reconsider the

25    restrictions that are upon me for 13 years, and in closing,

1   I want to thank you for your consideration and time today,

2   your Honor.  If given the opportunity again to contribute to

3   the industry I love, I promise you I will not let you down.

4               THE COURT:  Thank you, Mr. Martin.

5               THE DEFENDANT:  Thank you, your Honor.

6               THE COURT:  Mr. Engh?

7               MR. ENGH:  This is a unique case.  When I started

8   looking at the statute in response to some questions that

9   Mr. Martin had, I saw that there was a possibility of some

10  kind of redemption or a waiver of the 13 years, but there

11  wasn't a lot of case law on it.  There's not a lot of

12  definition.  The parties didn't find anything in the

13  circuits to speak of.  It looks like the statute was sort of

14  an anti-mob statute passed a long time ago, but that really

15  doesn't really matter to us.  The words are the words in the

16  statute and that's how we interpret them.

17              The question really today is whether he's been

18  rehabilitated.  It's the position of the Government, of

19  course, that he hasn't been, and it's our position that he

20  has been, and the vexing issue, I think, is that there's no

21  standard to determine what rehabilitation is.  This would

22  lead us to the great intersection of psychiatry and law,

23  that how can you tell someone has been changed, how can you

24  tell someone's not going to do the same thing again, how can

25  you tell a lesson has been learned, and it's not exactly

1    well defined.  But we can, you know, establish some posits,

2    I think, as to how to deal with this.

3            Number one, he is 63.

4            Number two, if you let the 13 years lapse, he's

5    75.  It would appear to be, in his family anyway, that the

6    early eighties are the end of the line.

7            He cannot be a plumber again.  What you're missing

8    here is to look at his arms where they had the surgery to

9    try to attach the tendons again, and it's almost shocking,

10   really, what the life of plumbing can do to yourself.  I

11   mean, it's -- and he was doing industrial, heavy plumbing.

12   He wasn't fixing toilets.  So it's not like he can be a

13   plumber again.

14           THE COURT:  I'm interested -- and I've forgotten.

15   I'm sure it's back in the file, but how long were you

16   actually a plumber before you became the business agent?

17           THE DEFENDANT:  Fifteen years, your Honor.

18           THE COURT:  How long were you doing the business

19   agent part of it?

20           THE DEFENDANT:  Nineteen years, your Honor.

21           THE COURT:  So it's been a long time since you've

22   actually done the labor part of it.

23           THE DEFENDANT:  When released -- if I can, when I

24   was released from prison, your Honor, I went back to work

25   with the tools and I worked in the field.

 1          THE COURT:  Did you have some injury then, or is

 2     the bicep problem and the arm problem from the years prior?

 3          THE DEFENDANT:  Yeah, from -- if you want to see

 4     them, I'll show you.

 5          THE COURT:  All right.  I mean, I'm fine to look

 6     at them.  I have a husband that just had knee replacement

 7     surgery, so I've been looking at lots of injuries and

 8     surgeries lately.

 9          MR. ENGH:  Tom, I think --

10          THE COURT:  Can you roll up your sleeve so that I

11     can see your arm?

12          THE DEFENDANT:  One surgery was not successful.

13     They had to take a nerve out of my right ankle and replace

14     it to my left (indicating) arm.

15          THE COURT:  Okay.  Sorry to take a detour you

16     didn't expect, Mr. Engh.

17          MR. ENGH:  That's all right.

18          You know, the reason we asked for a hearing,

19     though, is something near and dear to the defense bar, I

20     think, and near and dear to Tom and his family, that there

21     should be a mechanism in law for some kind of forgiveness

22     after you've done your penance.  This is rather a Judeo

23     ethic -- a Christian --

24          THE COURT:  I think I read something about that in

25     the paper this morning in another context.

1          MR. ENGH:  Okay.  Well, I missed that article, but

2     I'm sure I'll --

3          THE COURT:  I'm talking about all of the arguments

4     about Sara Jane Olson and the retribution and -- whole

5     different case than this.

6          MR. ENGH:  There is something to that.  I mean --

7     and the reason I thought that we should have a hearing is

8     that you should see him again after all these years, because

9     I think if there is a fault in the system -- and it's

10    certainly not your fault -- it's that we tend to forget

11    about people, and what happens is that this was a

12    tremendously important part of his life.  And I didn't

13    defend him six years ago, but I was representing witnesses

14    back in that case and so ran into all the players and the

15    parties and I did do his appeal to the Eighth Circuit, so we

16    have known each other for a long time.

17         And the problem we're running into in law is that

18    if you're a felon, you're really restricted forever.  I

19    mean, there's rent, it's hard to rent a place, it's hard to

20    get unemployment, it's hard to get even insurance, and we've

21    made it extremely difficult.  He's very lucky because he has

22    a union pension of sixty thousand a year and he's got a

23    loving wife who's in the front row, but, you know, if he

24    were someone who hadn't been protected by his colleagues and

25    friends and hadn't had a union job, he'd almost be on the

1    street right now.

2            And what I think what he wants, I know he wants,

3    is some kind of redemption for his past misconduct.  And he

4    is very much his father's son.  So, you know, if you track

5    his life, it is true.  He's got his failed marriage, his new

6    marriage.

7            And then the other thing he always talks about

8    besides his lovely wife is his father.  It comes up in

9    almost every conversation I've ever had with him, unasked.

10   And so he feels as if he shamed his dad and shamed his union

11   and he'd like to somehow remedy that.  And you can say

12   that's psychological hooey, but it really is, you know, the

13   root of his life, frankly, and it was in his union blood.

14   He can't take a nonunion job for a nonunion contractor,

15   because if he did that, he'd waive his pension.

16           And he's not in a position where he can work and

17   what he would like to do is either have the option of

18   working in union management again -- he's not there, he

19   can't even get elected, he doesn't have permission to run,

20   he can't really be active in the union -- or he would like

21   to work with a contractor who employees union individuals in

22   facilitating the work.  Granted, the construction trades are

23   minimal, we know that, but sooner or later it will rebound,

24   we hope, and he'd like a second chance.

25           And it seems -- I mean, I just think the law

1    should be about second chances.  I really believe that.  And

2    if we're not about that, then we have thousands of littered

3    bodies all over the place that have destroyed themselves at

4    42 or 19 or 20.  And he was by all our standards older when

5    he came to court on that major case that you had, and

6    so that's -- he'd like another opportunity.  If we don't

7    give it to him now, it just doesn't pay to wait.

8    Logistically, he can't do it.

9         But I'd also -- there's kind of an in-between

10   position that you can take.  You know, it's not an

11   all-or-nothing situation.  I mean, I think you could

12   reinstate him or give him permission to work with abundant

13   conditions:  You will do this, this and this in care of the

14   Department of Labor.  We will ask you to comply with this

15   condition, that condition, this condition, that condition.

16   You know, there's a middle ground here that you can take.

17        The only exhibit we have is Exhibit 1, which I'll

18   give to your clerk.  Those are the letters that he submitted

19   with his petition.  We'd like you to review those.

20        THE COURT:  All right.

21        MR. ENGH:  I don't think they're in the court

22   file.  I know I didn't scan them and put them in ECF because

23   some of the content is very personal.

24        THE COURT:  Okay.

25        MR. ENGH:  And I don't believe the Government has

1    any objection.

2              MR. GENRICH:  No, your Honor.

3              THE COURT:  All right.  We'll receive that then,

4    and, Katie, you can mark that Defense Exhibit 1 if it isn't

5    already.

6         (Defense Exhibit 1 received in evidence)

7              THE COURT:  Mr. Genrich.

8              MR. GENRICH:  Well, thank you, your Honor.

9              As the Court knows, I was not the counsel for the

10   Government with respect to either Mr. Biernat's matter or

11   Mr. Martin's matter and have come onto this even later than

12   Mr. Engh, but the Government does have a position.  And as

13   Mr. Engh indicated, there's sort of a paucity of authority

14   in these sorts of motions and it gives both Mr. Engh and the

15   Government somewhat of a free hand to shape their argument

16   based on what they think are the most important

17   considerations.

18             I do want to preface the Government's argument by

19   saying the Government doesn't seek to define Mr. Martin's

20   life by his criminal conviction.  The Government doesn't

21   seek to make character attacks on Mr. Martin, to comment on

22   his close personal and family relationships, or undermine

23   any of the important personal considerations referenced both

24   by Mr. Martin and by Mr. Engh.

25             But the Government believes this motion is not

1     about a couple of other things.  It's not about whether

2     Mr. Martin can be employed in any capacity, either outside

3     the union construction trade context or even within it.

4     Mr. Martin is not barred from being a union member, he's not

5     barred from accepting jobs related to union membership, and

6     he's not barred from being a plumber, from owning a plumbing

7     business, from working in some other capacity.

8          THE COURT:  Are there positions that he could hold

9     that would not involve physical labor that would not violate

10    the 504 disqualification?

11         MR. GENRICH:  Well, the statute defines the

12    excluded categories.  It's the Government's position and

13    belief that should he work for a management organization

14    that deals with labor relations issues -- and I think this

15    Metro PHCC is an organization that deals quite closely with

16    union contracting and labor management relations -- or in a

17    union position, that the 504 exclusion would apply.

18         And as the Court knows and the Government's

19    position, part of the Government's concern -- and I

20    appreciate Mr. Engh addressing this -- is that there isn't

21    really any specificity in Defendant's request.  It's still

22    unclear to the Government what position or positions it is

23    Mr. Martin would seek and what responsibilities those

24    positions would include.

25         THE COURT:  But he's kind of barred at this point

1    from finding out much about that, is he not?  I mean, the

2    statutory prohibition doesn't let him run for office and see

3    if he's elected, for example.

4         MR. GENRICH:  No, but the statutory prohibition

5    would not prevent him making a motion with specificity to

6    the Court indicating that he has explored X, Y or Z

7    positions either within or without the union in a management

8    position.  There have been some steps toward that.  He

9    indicated to the Labor Department that he wanted to work for

10   Metro PHCC I think is the abbreviation, and the person

11   involved with that organization was interviewed by Labor and

12   provided a summary in the affidavit.

13        But the Government's not aware and with respect to

14   Defendant it's not the Government's burden to explore what

15   position it is that he seeks and what the responsibilities

16   would be.  The Government doesn't believe he's prevented in

17   any way from saying to the Court, for example, "I'd like to

18   run for union office.  I'm not going to run for union

19   treasurer," which would be a position very close to the

20   management of money and implicate in the Government's mind

21   the prior convictions, "but I do want to run as union

22   steward, and here, your Honor, is what the position of union

23   steward involves."  The Government's not in a position to

24   evaluate a request like that because no request has been

25   made.

1        So, you know, I respectfully submit that the

2    Government believes both the Court and the Government is at

3    somewhat of a disadvantage to the extent the request here

4    is:  "I don't want to be excluded from working in a

5    management-related position," and Mr. Martin is not at

6    liberty to go find a position that includes undefined

7    responsibilities.  And that's why, although the Government

8    opposes this motion, the Government does believe that should

9    the Court grant the motion, Mr. Engh should be taken up on

10   the suggestion that first Mr. Martin identify to the Court

11   what position or positions it is he's seeking so the Court

12   can evaluate the appropriateness of those positions.

13        And secondly, that this be an exclusion and not a

14   reduction, meaning that the Court retains the ability to

15   supervise, even if from a distance, what sort of employment

16   activity Mr. Martin is engaged in and the Department of

17   Labor is given an opportunity to supervise in some sense

18   what it is Mr. Martin is doing.

19        So the motion is not fundamentally about whether

20   Mr. Martin works.  It's about what type of position

21   Mr. Martin works in.

22        The Government's not in any position to dispute

23   his injuries.  I would note that the Department of Labor

24   interviewed the employer for whom Mr. Martin did plumbing

25   work after he was released from prison.  The employer

1    indicated that Mr. Martin stopped doing that work in part

2    because the market was slow and there wasn't enough work to

3    go around.  But I'm in no position, you know, to dispute the

4    injury factor, but there is a record here that Mr. Martin

5    would be gainfully employed in the industry short of

6    assuming positions that in the Government's mind aren't

7    appropriate given the nature of the convictions.

8            THE COURT:  Can you be specific about what those

9    positions would be, ways that he could be gainfully employed

10   in the industry without violating the --

11           MR. GENRICH:  He can be a union member.  He can do

12   plumbing work, whatever the limitations are physically.

13   He's not barred from the exclusion from being a plumber.  He

14   would not be barred, for example, from running a plumbing

15   business, from employing other plumbers, from being the

16   person who does the bidding, soliciting the contracts,

17   et cetera, but operating a plumbing enterprise without doing

18   whatever work there may be physical limitations preventing

19   him from doing.  You know, whether he could take a nonunion

20   job or not is something that the Labor investigators are not

21   clear about, but clearly he could work as a union plumber

22   and he could employ union plumbers to work on behalf of a

23   company that he established.

24           So, he can work in the industry.  What the

25   Government is seeking is the exclusion remain in place with

1    respect to consulting management and labor management

2    positions or taking a union leadership position.

3           And again, while I think Mr. Engh and the Court is

4    correct that there aren't enough of these motions to really

5    flesh out a set standard, it's clear other courts have

6    looked at the nature of the offense, the nature of the

7    position sought and steps taken toward a clear demonstration

8    of rehabilitation.

9           And I know the Court -- I'm sure the Court has in

10   mind the nature of the offense here.  I must admit that once

11   I reviewed the presentence report, it provided additional

12   detail that's not revealed, for example, in the Eighth

13   Circuit opinion about the pattern of conduct in this case.

14   And it's not true that Mr. Martin only compromised the

15   market recovery fund with respect to the Biernat matter.  He

16   also compromised the fund with respect to four or five

17   friends and family members.  And the Court also applied an

18   obstruction enhancement based on his conduct during the

19   investigation.

20          I understand the defense view that that's water

21   under the bridge and Mr. Martin's a changed main, but in

22   determining whether it's appropriate for Mr. Martin to

23   assume a position within a union or within a management

24   organization when he's been convicted of very serious crimes

25   that go not to offenses under the statute that don't relate

1    to union matters -- sexual assault was the example cited in

2    one case -- but go to the very heart of what it means to be

3    trusted with union funds that were collected from the dues

4    of union members, is something that the Court believes the

5    -- the Government believes the Court should strongly

6    consider in deciding whether a return to a management or

7    consultant-type position is appropriate, the signal it would

8    send to both labor and management.  And the purposes behind

9    the statute which may have arisen out of organized crime,

10   but particularly when the exclusion was extended several

11   decades later from five to 13 years, were meant to protect

12   the integrity of unions and management, and appearances

13   matter.

14          And it's one of the points emphasized by those who

15   are opposed to reinstatement of Mr. Martin in the affidavit

16   that the nature of these offenses, that the compromise of

17   union funds supported by union dues are matters that are so

18   important, that the return of Mr. Martin to a position of

19   authority within a union or management would send a very

20   negative signal about the integrity of unions and the public

21   policy behind the Labor Management Relations Act.

22          You know, I'll just close, your Honor, unless the

23   Court has additional questions, with the rehabilitation

24   notion.

25          I share again Mr. Engh's threshold comments that

1    the standard is ill-defined, that rehabilitation doesn't

2    have a set meaning and there aren't factors defined in the

3    statute.  But having said that, Mr. Martin, again, without

4    in any way impugning his character, hasn't demonstrated four

5    years out the sort of clear demonstration of rehabilitation

6    that would support reinstatement given the nature of the

7    offense, the nature of the positions sought, and the

8    interviews summarized by Labor, including the interviews of

9    those who support his reinstatement, given the fundamental

10   gaps in many of those individuals' understandings about what

11   it is that brought Mr. Martin before the Court in the first

12   instance.

13          The Government understands that Mr. Martin's -- in

14   some narrow sense in the Government's view his future

15   livelihood is at stake with respect to the type of position

16   he can assume, but the nature of the convictions, the

17   ill-defined nature of the positions sought and the precedent

18   from the other cases, your Honor, really leave the

19   Government in a position where it strongly states its

20   opposition to exemption under these circumstances and does

21   believe that the remaining nine of the original 13-year bar

22   should remain in place at this point.

23          THE COURT:  All right.  Thank you.

24          MR. GENRICH:  Thank you, your Honor.

25          THE COURT:  Mr. Engh, as the maker of the motion,

1    I'll give you the final word.

2              MR. ENGH:  I appreciate my colleague's comments.

3              You know, it's one thing to say you haven't been

4    rehabilitated.  It's quite another thing to say how you do

5    it.  And so I'm mystified as to what he needs to show to

6    show that he's been rehabilitated.  And so it's an argument

7    that, you know, has some emotional weight, but it's rather

8    vacuous, because there's no standard behind it.  You just

9    haven't met the standard.  We don't know what it is, but you

10   won't ever meet it.

11             And in terms of we don't know what he's going to

12   do in terms of jobs or running for office, perhaps that's my

13   fault.  He came to see me.  I told him he couldn't run for

14   office because that would be meddling in the union's

15   business and there would be no point in running for any

16   office, because once he got elected he'd be kicked out, and

17   if he did run, I thought he would be in violation of your

18   order.  So, to say we don't know what job he's going to run

19   for is another cart before the horse.  I mean, it's a nice

20   argument, but it's utterly --

21             THE COURT:  But that is what you seek is for him

22   to run for an elective office.

23             MR. ENGH:  Right.  And, you know, they can reject

24   him.  You know, I appreciate the Government's concerns.  I

25   appreciate the PSI.  It's been six years.  And if the

1    membership wants to reject him, they can reject him, and if

2    he gets elected, you can put unbelievable restrictions on

3    him:  no money, no checks, no fund --

4              THE COURT:  How would I supervise that, though?  I

5    mean, he's off supervision.  I certainly don't want to

6    revisit supervision again.

7              MR. ENGH:  He's on supervision with the Department

8    of Labor.  They would supervise him, report to the Court on

9    the conditions.  It's still a court order he has to do that.

10   It's also a Department of Labor order that they imposed as

11   well at the same time your sentence came down.  He received

12   the same conditions that you gave him.

13             So, I mean, we should be in the position of giving

14   people a second chance, I really believe that, especially

15   when there's no articulation as to what he has to do other

16   than to say he hasn't done it.

17             THE COURT:  All right.  Well, I'm not going to

18   rule from the bench today.  I'm going to take a more careful

19   look at the exhibits produced and the law.  I looked at this

20   a few weeks ago and I think at the time I scheduled the

21   hearing and I want to review that, but there are a couple

22   things I would like to say today.

23             One of those is that I agree with Mr. Engh and I

24   think Mr. Genrich and the Government does too.  There should

25   be second chances.  I have no doubt about that.  I think

1    I've provided them in some situations where appropriate from

2    time to time and within my ability to do so.

3         I did take -- "offense" is too strong a word.  I

4    was a little bothered, Mr. Engh.  You did make some

5    reference to we never in federal court ever see people after

6    they're sentenced, and that isn't true.  I mean, I have made

7    efforts through the years to contact various defendants I've

8    sentenced.  And so there is some process, not a good one and

9    I agree with you that there should be a more ideally

10   procedural way for a judge to evaluate the effect of our

11   sentences on people.

12        The other thing that I disagree with Mr. Engh on

13   a tad is that I don't think the case really in front of me

14   is about rehabilitation in the sense that are you a changed

15   person.  I'm convinced you are and my decision isn't going

16   to be about whether I think you've learned something from

17   the process of being incarcerated or that I don't think it

18   had any effect on you.  I think it had a strong effect on

19   you and I accept and believe you when you say you're a

20   changed man and that you appreciate things in life, small

21   pleasures, love of family, things that never occurred to you

22   before and that we all tend to take for granted, but after a

23   period of incarceration I know the world you see through

24   very different eyes than you did prior to your

25   incarceration.

1          So I don't think whatever I end up ruling means

2     that I don't think Mr. Martin has not been rehabilitated.  I

3     think he's been significantly rehabilitated.  The issue

4     that's posed to me is, is this statutory exemption and

5     disqualification, should it be applied in this situation,

6     and I look at it from a narrow legal perspective.  I agree

7     with counsel there's not a whole lot of guidance for me out

8     there in how to apply the law, but I will take a careful

9     look at it and get you an order as soon as I can.

10          Thanks for coming in.

11          MR. GENRICH:  Your Honor?

12          THE COURT:  Yes?

13          MR. GENRICH:  Could I just be heard on two quick

14     factual things without argument?

15          THE COURT:  Sure.

16          MR. GENRICH:  One is, the Labor investigators tell

17     me that Mr. Martin could be appointed to a union position if

18     there was a vacancy before some election period, so it's not

19     necessarily true that the union members would be the

20     threshold or the only voice in whether he would ascend to a

21     union position.

22          And second, I didn't want there to be a

23     misunderstanding.  The Government's position isn't that

24     Mr. Martin should have run for union office and then

25     approached the Court.  The Government's position is that

1    whether Mr. Martin ran for, for example, union treasurer and

2    said, "You know, I've got control over millions of dollars

3    of funds" or some other position, the Government may still

4    oppose the other position, but some other position that

5    doesn't involve control over funds, for example, which

6    relates to the offenses should be a material consideration

7    in whether the exemption is lifted for purposes of that

8    position.  I agree with Mr. Engh's position --

9             THE COURT:  Kind of a cart-and-horse situation,

10   though.  I mean, at what point --

11            MR. GENRICH:  Well, the Government's concern would

12   be if the exemption's lifted without definition, that

13   Mr. Martin could ascend to a position where the statutory

14   bar speaks more strongly than some position that doesn't

15   involve, for example, the management of funds.  That's the

16   Government's point.  Not that he should have run for office

17   beforehand, but that there should be a definition of what he

18   wants to do for the union so we can measure the statutory

19   prohibition against the requested exemption.

20            THE COURT:  All right.  I understand.

21            Did you wish to respond to that, Mr. Engh, or --

22            MR. ENGH:  He has no intention of handling any

23   union funds or being a union treasurer or having anything to

24   do with the books and records.

25            THE COURT:  All right.  Thank you.

1          THE DEFENDANT:  Thank you, your Honor.

2      (Proceedings concluded at 11:36 a.m.)

3                      * * * * *

4

5

6

7              C  E  R  T  I  F  I  C  A  T  E

8

9

10     I, **TIMOTHY J. WILLETTE,** Official Court Reporter

       for the United States District Court, do hereby

11     certify that the foregoing pages are a true and

12     accurate transcription of my shorthand notes,

13     taken in the aforementioned matter, to the best

14     of my skill and ability.

15

16

17

18              */s/ Timothy J. Willette*

19

           **TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
20        Official Court Reporter - U.S. District Court
              1005 United States Courthouse
21              300 South Fourth Street
             Minneapolis, Minnesota  55415-2247
22                  612.664.5108

23

24

25